## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ULLICO INC.<br>1625 Eye Street, N.W.<br>Washington, DC  20006<br><br>on behalf of itself and all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>AMERICAN AIRLINES, INC.<br>4333 Amon Carter Boulevard<br>Fort Worth, TX  76155<br><br>DELTA AIR LINES, INC.<br>1030 Delta Boulevard<br>Atlanta, GA  30354<br><br>SOUTHWEST AIRLINES CO.<br>2702 Love Field Drive<br>Dallas, TX  75235<br><br>and<br><br>UNITED AIRLINES, INC.<br>233 S. Wacker Drive<br>Chicago, IL  60606<br><br>*Defendants.* | Civil Action No.:  15-2096<br><br><br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

1.     Plaintiff Ullico Inc., on behalf of itself and all others similarly situated, brings

this class action against Defendants for claims arising under the federal antitrust laws. Plaintiff's

allegations against Defendants are based on personal knowledge as to Plaintiff and Plaintiff's

own acts, and upon information and belief as to other matters.

## NATURE OF CLAIM

2.      American Airlines, Delta Air Lines, Southwest Airlines, and United Airlines (collectively, "Defendants") are the four largest commercial airlines in the United States.

3.      As a result of consolidation in the airline industry, Defendants account for nearly 85% of air passenger traffic in the United States since 2013.

4.      While consolidation of the airline industry has lined the pocketbooks of Defendants, competition has suffered and consumers have paid the price with higher fares, numerous fees, and reduced service.

5.      Defendants have taken advantage of market conditions, including increased consolidation and market concentration, by unlawfully agreeing to exercise "capacity discipline," which in industry parlance means limiting the supply of flights and seats. As a result of capacity discipline, Defendants were able to impose higher fares and reduce service, which resulted in record profits for Defendants.

6.      Defendants' price-fixing agreement to reduce or maintain capacity started at least as early as 2007, when they faced high fuel prices and a worldwide recession that weakened demand for air passenger transportation services.

7.      Whereas in past recessions and periods of high fuel prices Defendants continued to aggressively compete for market share, starting in 2007 they decided to do things differently by agreeing to a scheme to reduce competition among themselves through capacity discipline.

8.      Defendants reached their unlawful agreement through participation in industry conferences, Wall Street earnings calls, and by other means.

9.      As a result of their unlawful conspiracy, Defendants succeeded in raising prices for air passenger transportation services in the United States, causing injury to Plaintiff and the

Class who paid higher prices for air passenger transportation services than they otherwise would have paid in the absence of Defendants' illegal price-fixing conduct.

10.     Plaintiff brings this action for claims arising under the federal antitrust laws to recover damages, injunctive relief, and other relief for the substantial injuries it and others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the market for air passenger transportation services in the United States from at least as early as January 1, 2007 to the present (the "Class Period").

## JURISDICTION AND VENUE

11.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

12.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15a and 26) and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.     Venue is proper in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15a, 22 and 26, and 28 U.S.C. §§ 1391 (b), (c), and (d), because during the Class Period, one or more of Defendants resided, transacted business, had agents, or were found in this District; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

14.     This Court has personal jurisdiction over each Defendant because each, either directly or through the ownership and/or control of its subsidiaries: (a) transacted business throughout the United States, including in this District; (b) directly sold or marketed air passenger transportation services throughout the United States, including in this District; (c) had

substantial aggregate contacts with the United States as a whole, including in this District; and/or (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## THE PARTIES

15.     Plaintiff Ullico Inc. ("Ullico") is a privately-held holding company that offers insurance and investment products and services. Ullico has offices in Washington, D.C. Plaintiff Ullico, itself and through its wholly-owned subsidiaries, purchased passenger airline tickets directly from one or more of Defendants during the Class Period, and has been injured in its business or property by reason of Defendants' violations of law as alleged herein.

16.     Defendant American Airlines, Inc. ("American") is a Delaware corporation with its headquarters located at 4333 Amon Carter Boulevard, Fort Worth, Texas. It is a subsidiary of American Airlines Group Inc., also a Delaware Corporation with its headquarters located in Fort Worth, Texas. American provides air passenger transportation services throughout the United States, including flights to and from this District.

17.     Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its headquarters located at 1030 Delta Boulevard, Atlanta, Georgia. Delta provides air passenger transportation services throughout the United States, including flights to and from this District.

18.     Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its headquarters located at 2702 Love Field Drive, Dallas, Texas. Southwest provides air passenger transportation services throughout the United States, including flights to and from this District.

19.     Defendant United Airlines, Inc. ("United") is an Illinois corporation with its headquarters located at 233 S. Wacker Drive, Chicago, Illinois. It is a wholly-owned subsidiary

of United Continental Holdings, Inc., a Delaware corporation. United provides air passenger transportation services throughout the United States, including flights to and from this District.

## AGENTS AND UNNAMED CO-CONSPIRATORS

20.     At all relevant times, other airlines, entities, or persons, including, but not limited to, AirTran Airways (prior to its merger with Southwest), US Airways (prior to its merger with American), Continental Airlines (prior to its merger with United), and Northwest Airlines (prior to its merger with Delta), conspired with Defendants in their unlawful restraint of trade.

21.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

22.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

23.     In this Complaint, whenever reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### Background and Industry Consolidation

24.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which deregulated the domestic passenger airline industry and removed government control over fares,

routes, and market entry of new airlines, allowing market forces to dictate these and other facets of the industry.

25.     The passenger airline industry is primarily composed of three types of airlines: (i) legacy (or network), (ii) low-cost, and (iii) regional.

26.     Legacy airlines were in operation before the ADA and support large, complex hub-and-spoke operations with thousands of employees and hundreds of aircraft. These airlines provide service at various fare levels to a wide variety of domestic and international destinations. Today, the legacy airlines are America, Delta, and United.

27.     Low-cost airlines generally entered the market after deregulation and tend to operate less costly point-to-point service using fewer types of aircraft. Southwest entered the passenger airline industry as a low-cost airline. Southwest, however, has grown and matured and now is on par with the other Defendants in terms of annual revenues and overall domestic airline market share. Indeed, although American, Delta, and United are the legacy airlines, Southwest has moved far past its low-cost, upstart days and is now among the largest airlines in the country.

28.     Since deregulation in 1978, Defendants have competed over fares, routes, and seats. In recent years, however, the passenger airline industry has seen significant consolidation, which has led to higher fares, new and increased fees, and less options for American consumers.

29.     For example, Delta acquired Northwest in 2008, United and Continental merged in 2010, Southwest acquired AirTran in 2011, and US Airways and American merged in 2013.

30.     In 2001, there were nine major domestic airlines; now there are four: Defendants American, Delta, Southwest, and United. These four airlines account for approximately 85 percent of passenger traffic in the United States in 2013.

31.     The following figure provides a timeline of Defendants' mergers and acquisitions:



32.     Increased airline concentration in the U.S. over the past decade has resulted in the disappearance of several smaller, low cost U.S. airlines. In particular, America West merged into US Airways. And AirTran and the assets of ATA Airlines were acquired by Southwest. The only new domestic airline to enter the U.S. market during this decade was Virgin America. Outside of the largest four U.S. airlines, the share of the remaining smaller carriers, including the remaining low-cost carriers, has been stagnant over the last decade.[1]

33.     In addition, at 40 of the largest 100 airports, a single airline controls a majority of the market. At 93 of the top 100 airports, one or two airlines control a majority of the seats. As a result, "[a]irlines aren't going at each other like they used to. . . . They have their turf, and they very rarely go to the mattresses with one another" said Mike Boyd, an aviation consultant.[2]

---

[1] Dr. Fiona Scott Morton, R. Craig Romaine, and Spencer Graf, *Benefits of Preserving Consumers' Ability to Compare Airline Fares*, at 36-37 (May 19, 2015), http://www.traveltech.org/wp-content/uploads/2015/05/CRA.TravelTech.Study_.pdf.

[2] David Koenig and Scott Mayerowitz, *Analysis: Consolidation of U.S. Airline Industry Radically Reducing Competition*, Skift, July 14, 2015, http://skift.com/2015/07/14/analysis-consolidation-of-u-s-airline-industry-radically-reducing-competition/.

34.     For example:

- In Indianapolis, the two leading airlines controlled just 37 percent of the seats a decade ago, and domestic fares were 9 percent below the national average. Then the city's main airline, ATA, went bankrupt and was bought by Southwest, and its No. 2 carrier, Northwest, was absorbed by Delta. Now two airlines control 56 percent of the seats, and airfares are 6 percent above the national average.

- The Dayton, Ohio, airport was served by 10 airlines in 2005, and fares were 5 percent below average. Today, just four airlines fly there and prices are almost 10 percent above average.

- In 2005, US Airways controlled nearly 66 percent of the seats in Philadelphia. Now that US Airways has merged with American, the combined airline has 77 percent of the seats. Airfare has gone from 4 percent below average to 10 percent above it.

- Delta's hold on Atlanta, the world's busiest airport, increased during that same period from 78 percent of seats to just over 80 percent. At the same time, low-cost AirTran merged into Southwest and reduced flights there. Domestic airfares at the airport went from nearly 6 percent below average to 11 percent above.

- United announced in June 2015 that it will abandon JFK Airport and move its dwindling number of JFK flights to New Jersey's Newark airport, where it already controls 68 percent of the seats. At the same time, Delta announced that it will further decrease its small presence at Newark and take over United's share at

JFK, where Delta already has a large presence.[3] The U.S. Department of Justice filed a civil antitrust lawsuit on November 10, 2015 to block Delta's sale of its Newark slots to United.[4]

35.     While consolidation may have strengthened the financial health of Defendants, competition has suffered as a result. Indeed, as noted by the U.S. Department of Justice ("DOJ") in its complaint challenging the US Airways-American merger, "[i]n recent years . . . the major airlines have, in tandem, raised fares, imposed new and higher fees, and reduced service. Competition has diminished and consumers have paid a heavy price."[5] "With less competition," DOJ alleged, "airlines can cut service and raise prices with less fear of competitive responses from rivals."[6]

36.     In a statement before Congress opposing the US Airways-American merger, Professor Christopher Sagers noted: "[t]he legacy carriers have remained high cost, but through well protected pockets of market power and anticompetitive conduct they have been able to acquire or exclude almost all of the many low-cost carrier entrants ('LCCs') that have challenged them since deregulation."[7]

---

[3] Koenig and Mayerowitz, *supra* note 2.

[4] *See* Press Release, *Justice Department Files Antitrust Lawsuit to Block United's Monopolization of Takeoff and Landing Slots at Newark Airport*, Nov. 10, 2015, http://www.justice.gov/opa/pr/justice-department-files-antitrust-lawsuit-block-uniteds-monopolization-takeoff-and-landing.

[5] Am. Compl. at ¶ 1, *United States v. US Airways Group, Inc.*, No. 13-cv-1236 (D.D.C. Sept. 5, 2013) ("DOJ Amended Compl.").

[6] *Id.* at ¶ 2.

[7] Statement of Christopher L. Sagers Before the Subcommittee on Regulatory Reform, Commercial and Antitrust Law of the Committee on the Judiciary, United States House of Representatives, Concerning "Competition and Bankruptcy in the Airline Industry: The Proposed Merger of American Airlines and US Airways, Feb. 26, 2013.

37.     Low-cost carriers offer only limited competitive restraints to Defendants' pricing and supply decisions because they have less extensive networks and generally do not offer the kind of access to the lucrative business-oriented markets that Defendants provide.

38.     Yale Professor of economics and former deputy attorney general in the antitrust division of DOJ Dr. Fiona Scott Morton agrees, recently finding that "[a]s airlines merge and consolidate, the concern is that they can eliminate the competition between them with a greater ability and incentive to raise prices. This concern for rising airline prices has been warranted."[8]

39.     For example, the US Airways-American merger made American the world's largest airline. Since that merger, the airfares offered by American and US Airways have risen faster on the routes where substantial competitive overlap was eliminated by the merger.[9]

40.     The Consumer Union, the policy and advocacy arm of Consumer Reports, has also concluded that industry consolidation has "fundamentally altered the business incentives for airlines, creating just the kind of 'reduced competition' environment that leads to restricted capacity, inflated prices, and poorer service."[10]

41.     Indeed, in its recent letter to DOJ, the Consumer Union stated that "reduced capacity is the all-too-predictable result of the consolidation that has occurred in the airline industry, and particularly in the past decade, and no doubt was a prime objective for the merging airlines."[11]

42.     The letter went on:

---

[8] Scott Morton, *et al.*, *supra* note 1.

[9] *Id.* at 46.

[10] *Airlines are under investigation for possible price collusion*, ConsumerReports.org, July 10, 2015, http://www.consumerreports.org/cro/news/2015/07/airline-price-collusion/index.htm.

[11] Consumer Union Letter to The Honorable Loretta E. Lynch, Attorney General, U.S. Department of Justice, July 9, 2015, https://consumersunion.org/wp-content/uploads/2015/07/DOJ-airline-capacity-investigation-7915.pdf.

It makes good business sense for two competing airlines to each have its own flights on the same routes, and to compete with each other to bring passengers to its own flights. What some might view as "overcapacity" is actually a healthy byproduct of competition. Each of the airlines competes to fill more of its own seats; it is an indication that the airline is competing successfully that its competitor's seats are not being filled. But after the two competing airlines merge, what once made sense for competition now looks like redundancy. It is now more "efficient" for the merged airline to eliminate flights and move passengers onto fewer planes.[12]

43.     In the airline industry, however, recent experience has shown that capacity discipline has resulted in fewer flights and higher fares.[13]

44.     Indeed, as a result of the recent wave of mergers, "[w]e are unquestionably living with an air travel oligopoly."[14]

**Capacity Discipline**

45.     In the 2007-2008 timeframe, Defendants here were faced with high fuel costs and a global recession that weakened demand for air passenger transportation services in the United States.

46.     In the face of past weakened demand for their services, Defendants continued to vigorously compete with one another for customers, including by lowering airfares.

47.     During 2007 and 2008, however, Defendants decided to take a different course. Instead of competing, they agreed to collectively exercise "capacity discipline," which entailed restraining growth by limiting flights and seats. This tactic ensured higher fares and reduced service to consumers, and bigger profit margins for Defendants.

48.     Consolidation in the industry has made it easier for Defendants to agree to capacity discipline. DOJ's August 2013 lawsuit filed to block the merger of American and US

---

[12] *Id.*

[13] DOJ Amended Compl. at 23.

[14] Vinay Bhaskara, *US Airlines Won't Lose Capacity Discipline Because of Oil*, Airways News, Dec. 30, 2014, http://airwaysnews.com/blog/2014/12/30/us-airlines-wont-lose-capacity-discipline-because-of-oil/.

Airways found that each significant legacy airline merger in recent years has been followed by substantial reductions in capacity. According to DOJ, "[t]hese capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."[15]

49.      Defendants reached their unlawful price-fixing agreement to exercise capacity discipline through communications at meetings at airline industry conferences, participation in Wall Street earnings calls with financial analysts, and by other means.

50.      Indeed, Defendants recognized that engaging in capacity discipline was a key mechanism by which they could raise airfares and increase their profits.

51.      Defendants communicated to each other their commitment to this scheme by making repeated public statements discussing their ongoing intentions to exercise capacity discipline and the importance for doing so.

52.      For example, in a 2008 earnings call, AirTran (later Southwest) CEO Robert Fornaro stated: "The strongest comp correlation at the end of the day is capacity and pricing. Just raising prices without reduction in capacity is not going to raise the average fare. In order to support the price increases, the capacity has to drop."[16]

53.      In the same call, Fornaro assured that "[i]f oil prices remain at the same levels, I would guarantee you when we do our earnings calls in July you'll see more reductions in capacity. . . . The only certain way to get the average prices up is to accompany it with capacity adjustments. Those two things have to occur simultaneously."[17]

---

[15] DOJ Amended Compl. ¶ 60.

[16] AirTran Q1 Earnings call 2008.

[17] *Id.*

54.     American CFO Thomas Horton confirmed that capacity discipline in 2008-2009 worked: "When measured against 2007, 2009 mainline domestic capacity for network carriers was down a whopping 14.5%."[18]

55.     Fornaro confirmed the importance of capacity discipline in 2010: "We think there are growth opportunities, and we think we can participate in those growth opportunities, but also, ultimately, we think discipline is important."[19]

56.     In 2009, Jeff Smisek, then CEO of Continental prior to its merger with United, stated: "At Continental, we have seen the benefits from and understand the importance of capacity discipline. We have a bias towards capacity discipline, because we are firmly committed to achieving and sustaining profitability."[20]

57.     In 2010, Smisek reiterated that his airline was "focused on capacity discipline. . . . We want to make money."[21]

58.     Kathryn Mikell, United's CFO, similarly stated in 2010 that "[c]apacity discipline is clearly key to improving the economics of our business."[22]

59.     During a 2011 interview with Fortune Magazine, Smisek again confirmed the importance of capacity discipline post-merger with United:

---

[18] Jay Boehmer, *J.P. Morgan Notebook: Airline Share Plans for Capacity, Alliances, Revenue Growth*, Business Travel News, March 9, 2010, http://www.businesstravelnews.com/article.aspx?id=13101&ida=Airlines&a=btn (emphasis added).

[19] Jay Boehmer, *2010 Business Travel Survey: Carriers Continue to Make The Most Of Capacity Control*, Business Travel News, July 14, 2010, http://www.businesstravelnews.com/Business-Travel/Airline-News/Articles/2010-Business-Travel-Survey--Carriers-Continue-To-Make-The-Most-Of-Capacity-Control/.

[20] Continental Q4 Earnings Call 2009.

[21] Lori Ranson, *US carriers keep a grip on capacity*, Flightglobal, May 20, 2010, http://www.flightglobal.com/news/articles/us-carriers-keep-a-grip-on-capacity-342235/.

[22] Kyle Peterson, *Analysis: Airlines charging more to fly on cramped planes*, Reuters, June 18, 2010, http://www.reuters.com/article/2010/06/18/us-airlines-loads-idUSTRE65H43020100618.

What we learned is the importance of capacity discipline. Ours has been an industry where it's very easy to add seats, through increased frequencies, flying the aircraft longer, or taking delivery of additional aircraft. In the recession we were very disciplined in getting our capacity down, and as we saw the recovery with high fuel prices, we've been very disciplined at United and across the industry in making sure we've got the right level of capacity and not supplying overcapacity, driving down pricing.[23]

60.     Smisek maintained this view even as the economy improved and in the face of record profits. He stated in 2015, "We're going to run the airline for profit maximization and we're very focused on capacity discipline . . . . We will absolutely not lose our capacity discipline."[24]

61.     In 2010, Delta's CEO, Richard Anderson, confirmed that capacity discipline was profitable: "By the end of 2010, our fleet will be 91 aircraft smaller, but we will be able to generate essentially the same revenue for the year."[25]

62.     More recently, Anderson echoed Smisek's comments above by stating, "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."[26]

63.     During an earnings call in 2008, American CEO Gerard Arpey spoke of American's capacity discipline as a mechanism to increase prices: "that's what's behind our capacity reductions is to get capacity to a level where our price increases can stick."[27]

64.     Prior to the US Airways-American merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes.

---

[23] Geoff Colvin, *Jeff Smisek: United Continental's King of the Skies*, Fortune, April 21, 2011, http://archive.fortune.com/2011/04/19/news/companies/jeff_smisek_united_continental.fortune.index.htm.

[24] Aaron Karp, *Maintaining Capacity Discipline*, Air Transport World, Jan. 28, 2015, http://atwonline.com/blog/maintaining-capacity-discipline.

[25] Delta Q2 Earnings Call 2010.

[26] Karp, *supra* note 24.

[27] American Q2 Earnings Call 2008.

To support its plan, American made the largest aircraft order in industry history. US Airways called American's growth plan "industry destabilizing" and worried that American's plan would cause other carriers to react "with their own enhanced growth plans." Such a result would have been good for consumers, as competitive pressures would have driven down fares.[28] However, after the merger, the new American quashed that plan, choosing instead to continue exercising capacity discipline in agreement with its competitors.

65.     Indeed, US Airways stated that the merger with American "finishes industry evolution" by accomplishing US Airways' goal of "reduc[ing] capacity more efficiently."[29]

66.     International Air Transport Association ("IATA"), an international trade body representing of 240 domestic and international airlines and of which all four defendants are members, has similarly advocated the need for capacity reduction, the need for avoidance of competition for market share, and the link between "capacity discipline" and increased profitability for airlines.

67.     In June 2010, IATA Director General and CEO Giovanni Bisignani stated in a speech at IATA's Annual Meeting in Berlin, Germany that "excess capacity" was a temptation resulting from the recent "upturn" in the airline industry. Bisignani cautioned that the "discipline of chasing profits, not market share, is the only way to protect the bottom line."[30]

68.     An IATA press release on February 2, 2011, stated that, for North American carriers, a "key feature in 2010 was the capacity discipline."[31]

---

[28] DOJ Amended Compl. at 5-6.

[29] *Id.* at 25.

[30] G. Bisignani, State of the Air transport Industry, June 7, 2010, http://www.iata.org/pressroom/speeches/Pages/2010-06-07-01.aspx.

[31] Strong but Uncertainties in 2011-Severe Weather Dents Recovery, IATA Press Release, Feb. 2, 2011, http://www.iata.org/pressroom/pr/Pages/2011-02-02-01.aspx.

69.      Recently, an IATA analysis published in June of 2015 (in conjunction with its Annual Meeting) on the "Economic Performance of the Airline Industry" noted that the profitability of the United States airlines had increased the most, saying "US airlines consolidated after the global financial crisis and have been very disciplined about adding capacity."[32]

70.      Defendants recognized that in order for capacity discipline to work, it must be collectively implemented industry-wide. The financial benefits to Defendants from capacity discipline could not be realized unless all Defendants agreed not to compete by offering lower fares and increased capacity. One airline exercising capacity discipline alone is not in that airline's independent self-interest. If a single airline reduces capacity on its flights and raises prices, travelers will turn to other airlines with more capacity and lower fares. But, if the airlines act together, then travelers have no choice but to pay higher fares.

71.      Thus, Defendants reinforced the need for ongoing industry-wide capacity discipline by regularly communicating their intentions to each other throughout the Class Period to continue their unlawful agreement.

72.      Continental's CEO Larry Kellner stated in 2008 that "[o]ne thing that is different about this cycle compared to other economic cycles is that the *industry* including Continental has already cut a significant amount of capacity."[33] "[I]f you look across the system . . . on a relative basis to their growth in the past, you are seeing *significant capacity discipline across the industry*."[34]

---

[32] http://www.iata.org/whatwedo/Documents/economics/Economic-Performance-of-the-Airline-Industry-mid-year-2015-forecast-slides.pdf.

[33] Continental Q3 Earnings Call 2008 (emphasis added).

[34] Continental Q2 Earnings Call 2008 (emphasis added).

73.     American's Arpey confirmed Defendants' strategy: "As it turns out, ***the capacity reductions that we and our competitors put in place*** during the run-up in oil prices has left us, and arguably the industry in better shape as we face another significant hurdle presented by the global economic downturn."[35]

74.     In 2009, Smisek again called for the industry to "cut capacity to match the demand and ultimately we all need higher yields than we are getting because of the yields that we are getting, the demand we are getting, most all carriers are losing money and clearly that is not sustainable."[36]

75.     US Airways Chief Operating Officer, Robert Isom, stated before US Airways' merger with American, that "[t]he ***industry as a whole*** in 2009 took out about 6 percent of capacity . . . . ***We did our share with 4.5 percent***. As we look forward, we want to make sure that discipline is maintained going into 2010."[37] Indeed, in 2010, American's (then US Airways) Scott Kirby reiterated that "[o]ne of the most important things that happened in ***the industry is capacity discipline.***"[38]

76.     Delta's Glen W. Hauenstein similarly recognized in 2008 that Delta could not engage in capacity discipline "alone." He stated that Delta has to have capacity discipline "***in conjunction with the other carriers*** because certainly there are capacity cuts that we can do on our own, while they will help us, they will not remedy the industry woes. So as we look forward, we're hopeful that the other carriers act responsibly and look at the demand profiles as we move

---

[35] American Q4 Earnings Call 2008.

[36] Continental Q2 Earnings Call 2009.

[37] Boehmer, *supra* note 18.

[38] Boehmer, *supra* note 19.

into the fall. And I would say if the industry could achieve a 10 % reduction in capacity year over year by the fall that we'd be in pretty good shape given today's fuel environment."[39]

77.     Even as the economic climate improved, however, Defendants continued to maintain capacity discipline in order to keep airfare prices (and therefore profits) high.

78.     American's Arpey stated in 2010: "There are also hopeful signs that ***the industry has learned its lesson*** about keeping capacity growth in line with demand—***and will continue to apply that lesson*** even as the economy comes back."[40]

79.     In 2010, Delta President Ed Bastian said that "[m]aintaining capacity restraint in the face of a recovering economy is at the core of improving our financial results."[41]

80.     Scott Kirby, US Airways President, praised the industry in 2010 for its capacity discipline: "It's good to see the industry recognize we are in a mature industry. . . . ***This isn't a growth industry anymore***."[42]

81.     US Airways (through Kirby) communicated to its competitors in mid-2010 the intention not to consider capacity growth: "They [airline CEOs] are much more focused on returns and financial performance than they are on empire building, 'how big is my airline, what is my market share, how many cities do I fly to,' etc. Things can change in a hurry, but ***I don't***

---

[39] Delta Q1 Earnings Call 2008 (emphasis added).

[40] David Jonas, *Airline Executives: This time will be different*, Global Travel Industry News, June 17, 2010, http://www.eturbonews.com/16791/airline-executives-time-will-be-different (emphasis added).

[41] Michael Fabey, *Airlines limit capacity despite strong Q2*, Travel Weekly, July 23, 2010, http://www.travelweekly.com/Travel-News/Airline-News/Airlines-limit-capacity-despite-strong-Q2/.

[42] Boehmer, *supra* note 19.

***think rapid capacity growth is going to become a problem in this industry***, at least for the foreseeable future."[43]

82.     In 2012, US Airways executives recognized that "[i]ndustry mergers and ***capacity discipline*** expand margins."[44]

83.     More recently, Southwest's CEO, President, and Chairman Gary Kelly stated on an earnings call that "[t]he economy, at least in our view, has been more consistent, more stable, driving more confidence and more consistent travel demand. That's showing up**. The industry is not adding a lot of capacity as well,** s**o** the supply-demand obviously seems to be, from an industry perspective, in nice balance."[45] Indeed, Southwest hasn't "grown capacity since 2011."[46]

84.     American's CFO, Derek Kerr, echoed this strategy: "There has been a lot of talk of capacity changes in response to lower fuel price. You won't see any changes from us in the near future since we continue to run the airline as though high fuel prices will return."[47]

85.     Indeed, American announced on July 10, 2015 that it lowered its capacity growth guidance for the year.[48]

86.     United similarly announced that it will continue its capacity discipline, even as the economy improved. Former United CEO Smisek stated on a recent earnings call: "The US airline industry has transformed itself over the last several years through consolidation and

---

[43] *Airline executives: This time will be different*, Global Travel Industry News, June 2010, http://www.eturbonews.com/16791/airline-executives-time-will-be-different.

[44] DOJ Amended Compl. at 26 (emphasis added).

[45] Southwest Q3 Earnings Call 2014 (emphasis added).

[46] Southwest Q4 Earnings Call 2015.

[47] American Q4 Earnings Call 2014.

[48] Chelsey Dulaney, *American Airlines Lowers Capacity Growth Guidance*, Wall Street Journal, July 10, 2015.

capacity discipline matching capacity with demand and United will continue its discipline growing capacity less than GDP regardless of the price of oil."[49] Smisek also told investors during a Q4 2014 earnings call that United is "very focused on maintaining capacity discipline vis-à-vis GDP. And we're going to continue that irrespective of what the fuel price is."[50]

87.     Delta is also following suit, stating at the end of 2014 that it's "trimming capacity as we speak."[51]

88.     Mergers in the industry have aided in Defendants' exercising and policing of capacity discipline. DOJ, in its complaint to block the US Airways-American merger, fully recognized that "[l]egacy airlines have taken advantage of increasing consolidation to exercise 'capacity discipline.' The planned merger would be a further step in that ***industry-wide effort***."[52]

89.     DOJ further explained: "Each significant legacy airline merger in recent years has been followed by substantial reductions in service and capacity. These capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."[53]

90.     While Defendants initially agreed to capacity discipline to ostensibly combat high fuel costs and weakened demand caused by the recession that began in 2008, over the last year, oil prices have dropped by more than 50 percent and airlines have saved billions of dollars on their biggest expense, jet fuel. In April 2015, U.S. airlines paid $1.94 per gallon for jet fuel,

---

[49] United Q4 Earnings Call 2014.

[50] *Id.*

[51] Delta Q4 Earnings Call 2014.

[52] DOJ Amended Compl. at 23 (emphasis added).

[53] *Id.*

down 34 percent from the year before. In the first quarter of 2015 alone, Defendants saved about $3.3 billion on fuel.

91.     Capacity discipline and the limited competition faced by Defendants have helped them post some of the biggest profits in history. In the past two years, U.S. airlines earned a combined $19.7 billion in revenue. IATA projected that North American airline industry net after-tax profits would more than double this year to over $13 billion, a record. That projection, however, was based on an average cost of $85 a barrel for Brent crude oil. Today, the price is under $50 a barrel, so profits are likely even higher. In the first quarter of 2015, American alone logged $1.2 billion in profit, its most profitable three months ever.[54] U.S. airlines collectively reported an after-tax net profit of $3.1 billion in the first quarter of 2015, up from $241 million in the fourth quarter of 2014 and up from $507 million in the first quarter of 2014.[55]

92.     As detailed in the graphic below, capacity discipline has paid off for Defendants:



[54] Drew Harwell, Ashley Halsey III, and Thad Moore, *Justice Dept. investigating potential airline price collusion*, The Washington Post, July 1, 2015.
[55] DOT Bureau of Transportation Statistics, 1st Quarter 2015 Airline Financial Data, http://www.rita.dot.gov/bts/press_releases/bts030_15.

93.     Yet those savings and staggering increased profits have not been passed on to passengers. The average domestic flight last year cost $391, the highest price since federal statisticians started tracking fares two decades ago. Adjusted for inflation, fares are at a 12-year high. Airlines have also made billions of dollars more on bag-checking, reservation, and other recently-added fees.[56]

94.     As seen in the below chart, although jet fuel prices have significantly declined over the last four years, the average price of domestic airfares has actually *increased*:



95.     Not only are airfares rising rather than falling, seat capacity also has not rebounded despite increased demand for air travel due to Defendants' continued agreement to capacity discipline.

---

[56] Harwell, *et al.*, *supra* note 54.

96.     Since 2007, airline seat capacity has been reduced or maintained through Defendants' unlawful agreement. The chart below graphically depicts legacy airline capacity using available seat miles, a commonly-used metric in the airline industry to measure capacity:[57]



97.     As Dr. Scott Morton has observed, the airlines industry in the U.S. is highly concentrated, and the airlines are exercising their market power by pricing to travel demand rather than to cost. In other words, they respond as little as possible to cost changes, especially when costs are falling.[58] They avoid competing with each other by cutting ticket prices to fill seats, instead keeping prices high by restricting supply of seats. In the context of lower fuel prices, Delta's chief revenue officer "said that the company does not want to turn the airline into a 'commoditized' business that is just about lower prices."[59] Further, American President Scott Kirby has stated that "[w]e always have and always intend to price to demand as opposed to

---

[57] Data compiled from the U.S. Department of Transportation's ("DOT") Bureau of Transportation Statistics.

[58] Scott Morton, *et al.*, *supra* note 1.

[59] *Id.* at 38-39 (quoting "Delta Air Lines is Saving $2 Billion on Fuel," CNN.com, January 20, 2015).

cost." American's chairman and CEO agreed, saying "[p]ricing simply goes with demand, I keep saying. So when demand is strong, you see prices move accordingly. When demand drops, you see pricing move accordingly."[60]

98.     As IATA has reported, although there is "strong demand growth" for domestic passenger air travel, airlines have refused to meet the demand with increased capacity, instead driving up the prices of domestic airline tickets.

99.     In the absence of collusion, in a competitive market, airlines would add capacity to popular routes where they saw increased demand and the opportunity to capture business from a competitor. And given low fuel prices, one would expect that at least one airline would lower its prices to pick up market share and make up the per ticket dollar decline in volume. At the very least, cost savings in the form of lower airfares due to decreased jet fuel costs should occur. However, due to Defendants' anticompetitive behavior, that has not happened. As long as the agreement to reduce or maintain capacity across the industry continues, there's no incentive for airlines to reduce fares, no matter how low fuel prices or other costs go.

100.     The Business Travel Coalition ("BTC") has warned that reduced competition among airlines following the recent slew of mergers has increased air travel price. "The number one concern that antitrust experts have—with no close second—as with regard to radical consolidation of any industry, is the risk of tacit competitor coordination on policies, practices and prices among a reduced number of industry participants," said BTC Chairman Kevin Mitchell. "Since recent U.S. airline mega-mergers, we have witnessed near constant airline CEO calls for 'capacity discipline' during industry gatherings and analyst earnings calls only to be echoed by analysts in follow-on earning calls with other airlines. This represents perhaps the

---

[60] *Id.* (quoting "American Airline Execs: Demand Determines Our Fares, Not Our Costs," The Dallas Morning News, Airline Biz Blog, Terry Maxon, January 27, 2015).

darkest hours of airline coordination as well as a too-cozy harmonization between airlines and Wall Street."[61]

101.     As DOJ predicted in its complaint against the US Airways-American merger: "Coordination becomes easier as the number of major airlines dwindles and their business models converge. If not stopped, the merger would likely substantially enhance the ability of the industry to coordinate on fares, ancillary fees, and service reductions."[62] A prescient statement from DOJ, as this is exactly what has happened. In the face of an improving economy and stronger demand, rather than competing for market share by increasing capacity and lowering prices, Defendants have continued their agreement to reduce or maintain capacity, thus ensuring continued higher prices by reducing competition among them.

**International Air Transport Association 2015 Annual Meeting**

102.     In May 2015, Southwest's CEO, Gary C. Kelly, announced that the airline, whose image is closely tied to discount fares, was going to expand capacity in 2015 by as much as eight percent, with the expansion spilling over into 2016.[63]

103.     But Southwest's competitor airlines did not want Southwest to break rank on their agreement for capacity discipline. At the IATA annual meeting in Miami, Florida, which took place from June 7-9, 2015, Southwest came under fire for its announcement.

104.     At the meeting, several Defendants spoke publicly about the continued need for discipline within the industry, reinforcing their commitment to the collusive price-fixing

---

[61] Adam Leposa, *U.S. Justice Department Launches Airline Antitrust Probe*, Travel Agent Central, July 2, 2015, http://www.travelagentcentral.com/air-travel/us-justice-department-launches-airline-antitrust-probe-52146.

[62] DOJ Amended Compl. ¶ 46.

[63] James B. Stewart, *'Discipline' for Airlines, Pain for Fliers*, NY Times, June 11, 2015, http://www.nytimes.com/2015/06/12/business/airline-discipline-could-be-costly-for-passengers.html?_r=0.

agreement through industry-wide capacity reduction and maintenance. The message to Southwest was clear.

105.     Delta's Bastian stated that Delta was "continuing with the discipline that the market place is expecting."[64]

106.     American's CEO, Doug Parker, stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that."[65]

107.     Air Canada's chief executive, Calin Rovinescu, echoed these sentiments, saying "People were undisciplined in the past, but they will be more disciplined this time."[66]

108.     "Discipline," as *New York Times* reporter James B. Stewart stated in an article reporting on the meeting, is classic oligopoly-speak for limiting flights and seats, charging higher prices, and reaping bigger profit margins.[67]

109.     In the same article, Dr. Scott Morton concurred: "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity." "And when there aren't enough seats, airlines raise prices. That's what we've been seeing."[68]

110.     Through these public comments by the airlines' top executives, the airlines have communicated to each other that it is in their joint interest to keep capacity tight and prices high.

111.     The pressure from Defendants and other airlines worked: Southwest quickly moved to reassure investors it was not going rogue. "We have taken steps this week to begin

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent," Mr. Kelly stated.[69]

112.     The 2015 annual IATA meeting is an example of Defendants' use of an industry conference to monitor and reaffirm their agreement on capacity discipline.

**The Airline Industry is Conducive to Collusion**

*The Industry is Highly Concentrated*

113.     In the last decade, there has been a wave of mergers among major U.S. airlines. In 2005, there were nine major airlines; now there are four—the Defendants—and they account for over 80% of the market. The airlines market today is a highly-concentrated oligopoly that is conducive to collusive behavior. As DOJ has observed: "Few large players dominate the industry; each transaction is small; and most pricing is readily transparent."[70]

114.     As Assistant Attorney General William Baer recently commented: "In my experience looking at markets with just a few players, sometimes there is a temptation to coordinate behavior."[71]

115.     In 2013, DOJ sued to block the merger between US Airways and American, fearing reduced competition and harm to consumers, and only allowed the merger after the airlines agreed to divest certain airport slots to competitors. DOJ claimed that the merger would reduc[e]the number of legacy airlines and align[] the economic incentives of those that remain, . .

---

[69] *Id.*

[70] DOJ Amended Compl. at 15.

[71] Peter Coy and David McLaughlin, *What Does It Take to Prove Airline Collusion*, Bloomberg, July 16, 2015, http://www.bloomberg.com/news/articles/2015-07-16/what-does-it-take-to-prove-airline-collusion-.

. mak[ing] it easier for the remaining airlines to cooperate, rather than compete, on price and service."[72]

116.     US Airways' executives, who now run the new American, have long been proponents of consolidation, and believe that the industry before 2005 had "too many" competitors, causing an "irrational business model." Since 2005, there has been significant consolidation in the industry, and US Airways CEO stated in 2011 that "fewer airlines" is a "good thing." US Airways' President explained that same year: "Three successful fare increases – [we are] able to pass along to customers because of consolidation." He similarly boasted at a 2012 industry conference: "Consolidation has also . . . allowed the industry to do things like ancillary revenues [*e.g.*, checked bag and ticket change fees] . . . . That is a structural permanent change to the industry and one that's impossible to overstate the benefit from it." In essence, industry consolidation has left fewer, more-similar airlines, making it easier for the remaining airlines to raise prices, impose new or higher baggage and other ancillary fees, and reduce capacity and service.[73]

117.     Increasing consolidation among large airlines has hurt passengers. The major airlines have copied each other in raising fares, imposing new fees on travelers, reducing or eliminating service on a number of city pairs, and downgrading amenities. An August 2012 presentation from US Airways observes that consolidation has resulted in "Fewer and Larger Competitors." The structural change to "fewer and larger competitors" has allowed "[t]he industry" to "reap the benefits." Those benefits to the industry are touted by US Airways in the

---

[72] DOJ Amended Compl. at 3.
[73] DOJ Amended Compl. at 4.

same presentation as including "capacity reductions" and new "ancillary revenues" like bag fees.[74]

*Pricing is Transparent and Easily Monitored*

118.     Airline pricing is transparent and easily monitored, and is conducive to real-time communications and conspiracy among competitors. DOJ was concerned in its investigation of the US Airways-American merger that "[t]he structure of the industry is already conducive to coordinated behavior." As one example, DOJ noted that airlines closely watch each other's fares and consistently match each other's fare increases. As another example, DOJ pointed to the use of "cross-market incentives" ("CMIs") to deter fare wars. "A CMI occurs where two or more airlines compete against each other on multiple routes. If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market—a CMI—where the [original] discounting airline prefers a higher fare. CMIs often cause an airline to withdraw fare discounts." In other words, the airline industry is structured such that, to the extent there is an understanding or agreement to act in coordinated ways, airline competitors would be (and are) able to punish each other quickly for stepping out of line.  This creates a strong enforcement mechanism for any collusive activity.[75]

119.     All airlines also have complete, accurate, and real-time access to every detail of every airline's published fare structure on every route through the airline-owned Airline Tariff Publishing Company ("ATPCO"). US Airways' management has called ATPCO "a dedicated price-telegraph network for the industry." The airlines use ATPCO to monitor and analyze each other's fares and fare changes and implement strategies designed to coordinate pricing. Airlines have previously used ATPCO to engage in coordinated behavior. In 1992, DOJ sued ATPCO

---

[74] *Id.* at 14.
[75] *Id.* at 15-16.

and eight major airlines, including Defendants American, Delta, and United, alleging that the airlines used the ATPCO electronic fare submission and dissemination system to fix prices.

120.     The complaint alleged that from at least as early as April 1988 and continuing through at least May 1990, each of the airline defendants agreed to fix prices by increasing fares, eliminating discount fares, and setting fare restrictions for tickets purchased for travel between cities in the United States. These agreements were reached and effectuated through the airline defendants' use of the computerized fare dissemination services of ATPCO to: (1) exchange proposals and negotiate fare changes; (2) trade fare changes in certain markets in exchange for fare changes in other markets; and (3) exchange mutual assurances concerning the level, scope, and timing of fare changes.[76]

121.     The consent decrees ultimately entered into banned improper signaling of future pricing intentions, which had cost consumers up to $2 billion in travel expenses.[77]

122.     US Airways also communicated directly with a competitor when it was upset by that competitor's efforts to compete more aggressively. In 2010, one of US Airways' larger rivals extended a "triple miles" promotion that set off a market share battle among legacy carriers. The rival airline was also expanding into new markets and was rumored to be returning planes to its fleet that had been mothballed during the recession. US Airways' CEO complained about these aggressive maneuvers, stating to his senior executives that such actions were "hurting [the rival airline's] profitability – and unfortunately everyone else's." US Airways' senior management debated over email about how best to get the rival airline's attention and bring it back in line with the rest of the industry. In that email thread, US Airways' CEO urged

---

[76] Consent Decree, *U.S. v. Airline Tariff Publishing Co., et al.*, No. 92-2854 (D. D. C. Mar. 17, 1994).

[77] *Id.*

the other executives to "portray[ ] these guys as idiots to Wall Street and anyone else who'll listen." Ultimately, to make sure the message was received, US Airways' CEO forwarded the email chain—and its candid discussion about how aggressive competition would be bad for the industry—directly to the CEO of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)[78]

*High Barriers to Entry*

123.    There are also high barriers to entry given, among other things, government regulations restricting access to airports and gates, large capital requirements for technology and equipment, and the nature of the ticketing and reservation system, which means existing firms can raise prices above competitive levels and earn above-normal levels of profits.

*Opportunities to Conspire*

124.    Collusion here is also facilitated by Defendants' membership in trade groups, such as IATA, discussed above, and Airlines for America. The CEOs of each Defendant serve on the board of directors of Airlines for America.

*Common Ownership*

125.    Defendants each have common large shareholders that regularly communicate with Defendants regarding current business conditions and future plans. Due to their cross-ownership, these shareholders are motivated to increase industry profitability rather than individual Defendants' profitability. Therefore, this cross-ownership acts as a strong and durable conduit of information in furtherance of Defendants' conspiracy.

**U.S. Senators' Call for Investigation**

126.    Defendants' conduct has also caught the eye of members of Congress.

---

[78] DOJ Amended Compl. at 16-17.

127.     In a December 2014 statement, U.S. Senator Charles Schumer (D-N.Y.) called

for a federal investigation of U.S. airlines amid falling gas prices.

128.     Senator Schumer stated, "At a time when the cost of fuel is plummeting and

profits are rising, it is curious and confounding that ticket prices are sky-high and defying

economic gravity. …. So I'm urging the feds to step in and do a price investigation on behalf of

consumers who must buy holiday travel tickets that can break the bank. The industry often raises

prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline

in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather.

That is why I urge the DOJ and DOT to immediately investigate why airline profits are not more

efficiently being passed down to consumers."[79]

129.     On June 17, 2015, U.S. Senator Richard Blumenthal (D-Conn.) also asked DOJ

to immediately investigate collusion and anticompetitive behavior amongst U.S. airline

companies following the IATA annual conference in Miami.

130.     In his letter to Assistant Attorney General William Baer, Blumenthal cited

DOJ's investigation into the merger of American and US Airways and DOJ's initial complaint,

which stated: "The structure of the airline industry is already conducive to coordinated behavior

. . . . the legacy airlines closely watch the pricing moves of their competitors. When one airline

'leads' a price increase, other airlines frequently respond by following with price increases of

their own."[80]

---

[79] Statement by U.S. Senator Charles E. Schumer, Dec. 14, 2014,
http://www.schumer.senate.gov/newsroom/press-releases/schumer-as-fuel-costs-plummet-
airfares-for-nyers-this-holiday-season-remain-extremely-high_calls-for-federal-investigation-
into-why-dramatically-lower-fuel-costs-and-record-airline-profits-are-not-being-passed-on-to-
consumers-through-lower-fares.
[80] U.S. Senator Richard Blumenthal Letter to Assistant Attorney General William Baer, June 17,
2015,

131.     Senator Blumenthal further stated:

As you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, ***most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins***. In light of the recent unprecedented level of consolidation in the airline industry, this public display of strategic coordination is highly troubling.

Therefore, I urge the Justice Department to investigate this apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry. DOJ itself played a part in this consolidation by approving several mergers and now consumers are paying sky-high fares as airlines engage in market conduct designed to keep capacity artificially low.

…

The Justice Department also correctly predicted that this kind of behavior would continue should the merger be allowed to proceed — as it ultimately was. In the original complaint, DOJ wrote, "The structure of the airline industry is already conducive to coordinated behavior … the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."
To bring home the point, the Complaint follows, "Coordination becomes easier as the number of major airlines dwindles and their business models converge."

I agree. I therefore urge the Antitrust Division to conduct a full and thorough investigation of anticompetitive, anti-consumer conduct and misuse of market power in the airline industry, evidenced by recent pricing patterns as well as remarks made at the IATA conference. Consumers are paying sky-high fares and are trapped in an uncompetitive market with a history of collusive behavior. If you find that these comments were coordinated to punish Southwest Airlines' announcement of capacity increases, I urge you to use all the tools at your disposal to punish this anti-competitive and anti-consumer behavior.[81]

**Government Investigation**

132.     DOJ swiftly responded by launching an investigation into potentially

anticompetitive conduct in the airline industry. On July 1, 2015, Associated Press reported that

DOJ had sent civil investigative demands ("CIDs") to a number of airlines on June 30, 2015,

demanding copies of all communications the airlines had with each other, Wall Street analysts,

and major shareholders about their plans for passenger-carrying capacity, or "the undesirability

---

http://www.blumenthal.senate.gov/imo/media/doc/20150617%20Blumenthal%20to%20DOJ%20 Airline%20Coordition.pdf.
[81] *Id.* (emphasis added).

of your company or any other airline increasing capacity." A spokesperson for DOJ, Emily Pierce, confirmed this report, saying DOJ was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping ticket prices high.

133.    The CID seeks the following information:

(a)    Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

(b)    Give us any documents "discussing (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

(c)    Give us any of your documents that talk about changes in your capacity or that of your competitors.

(d)    Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

(e)    Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

(f)    Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

(g)    We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

(h)     Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conference with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

(i)     We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.[82]

134.     On September 22, 2015, Bloomberg reported that DOJ issued an additional set of CIDs to the Defendants, this time for details about meetings with the Defendants' major shareholders in which "industry capacity" was discussed. The investors about whom DOJ sought information were those whose stakes in the airlines exceed 2 percent of the companies' ownership, a category that includes some of the biggest U.S. money managers. DOJ also sought documents about the Defendants' meetings with financial analysts, including, on information and belief, analysts that cover the domestic airlines industry.[83]

135.     According to DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation. In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to

---

[82] Terry Maxon, *Justice is looking into airline collusion on holding down capacity*, The Dallas Morning News, July 1, 2015, http://aviationblog.dallasnews.com/2015/07/ap-justice-is-looking-into-airline-collusion-on-holding-down-capacity.html/.

[83] David McLaughlin and, Mary Schlangenstein, *U.S. Looks at Airline Investors for Evidence of Fare Collusion*, Bloomberg, Sept. 22, 2015, http://www.bloomberg.com/news/articles/2015-09-22/do-airfares-rise-when-carriers-have-same-investors-u-s-asks.

believe that an antitrust violation may have been committed."[84] Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy. The greater the potential significance of the matter, the more likely the request to open an investigation will be approved."[85]

136.    American Antitrust Institute President, Diana Moss, stated that the investigation by DOJ was "a long time coming." Airlines have continuously communicated "to each other that it was in their joint interest to keep capacity tight and to keep prices high."[86]

137.    All four Defendants have confirmed receipt of DOJ's CID.

138.    On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office is conducting a similar investigation into collusive activity among air carriers and had sent letters to Delta, United, American, and Southwest.

## CLASS ACTION ALLEGATIONS

139.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased air passenger transportation services for flights within the United States from Defendants or any predecessor, subsidiary, or affiliate thereof, at any time from January 1, 2007 to the present.

140.    Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government.

---

[84] Antitrust Division Manual, Ch. III § B(1), http://www.justice.gov/atr/file/761141/download.
[85] *Id.*
[86] Harwell, *et al.*, *supra* note 54.

141.    While Plaintiff does not know the exact number of the members of the Class, Plaintiff believes there are at least hundreds of Class members located throughout the United States, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

142.    There are questions of law and fact common to all members of the Class, including, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize the prices of air passenger transportation services sold in the United States;

(b)    Whether Defendants and their co-conspirators violated Section 1 of the Sherman Act;

(c)    The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    The identity of the participants of the alleged conspiracy;

(e)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(f)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(g)    The effect of the alleged conspiracy on the prices of air passenger transportation services sold in the United States during the Class Period;

(h)    Whether Plaintiff and the Class had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

        (i)      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiff and the Class; and

        (j)      The appropriate class-wide measure of damages for the Class.

143.     Plaintiff is a member of the Class, and Plaintiff's claims are typical of the claims of the Class. Plaintiff will fairly and adequately protect the interests of the Class.

144.     Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for air passenger transportation services purchased directly from Defendants and/or their co-conspirators. In addition, Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

145.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

146.     Questions of law and fact common to the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

147.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would engender. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation.

148.     Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY

149.     As a result of their unlawful conduct, Defendants succeeded in fixing, raising, maintaining, or stabilizing prices for air passenger transportation services in the United States during the Class Period.

150.     Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Competition in the market for air passenger transportation services has been restrained;

(b)     Prices paid by Plaintiff and members of the Class for air passenger transportation services were fixed, raised, maintained, and/or stabilized at artificially inflated levels in the United States;

(c)     Plaintiff and the members of the Class who purchased air passenger transportation services have been deprived of free and open competition; and

(d)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property.

151.     By reason of the alleged violations of the antitrust laws as described herein, Plaintiff and the Class have sustained injury to their businesses or property, having paid higher prices for air passenger transportation services than they would have paid in the absence of Defendants' illegal conduct, and, as a result, have suffered damages in an amount presently

undetermined. This is an injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT

152.     Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein no earlier than July 1, 2015, the date when news reports first disclosed that DOJ was investigating Defendants for "possible unlawful coordination" to limit capacity increases.

153.     No information in the public domain was available to Plaintiff and members of the Class prior to the announced DOJ investigation on July 1, 2015, which revealed sufficient information to suggest that Defendants were involved in an anticompetitive conspiracy to restrain trade in the market for air passenger transportation services.

154.     Defendants' and their co-conspirators' collusive acts in furtherance of their conspiracy were inherently self-concealing and carried out in a manner that defied and precluded detection by Plaintiffs and members of the Class.

155.     Because Defendants and their co-conspirators successfully and actively concealed the existence of their conspiracy prior to July 1, 2015, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying artificially high prices for passenger airline fares.

156.     Moreover, Plaintiff and members of the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their conspiracy. The conspiracy as alleged herein was fraudulently concealed by Defendants through various means and method, including, but not limited to, secret

meetings and surreptitious communications among Defendants by the use of telephone and/or in-person meetings at trade association gatherings (and elsewhere) in order to prevent the existence of written records.

157.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators until July 1, 2015, Plaintiff and the members of the Class had no knowledge of the alleged conspiracy or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

158.     None of the facts or information available to Plaintiff and members of the Class prior to July 1, 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

159.     For these reasons, the statute of limitations applicable to Plaintiff and the Class' claims alleged herein was tolled and did not begin to run until July 1, 2015.

## CAUSE OF ACTION
### (Violation of Sections 1 of the Sherman Act)

160.     Plaintiff repeats and re-alleges the allegations set forth above.

161.     Beginning at a point in time during Class Period, Defendants entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Sections 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition for air passenger transportation services in the United States.

162.     In particular, Defendants have agreed, combined, and conspired to raise, fix, maintain, or stabilize the prices of airfares in the United States.

163.     As a result of Defendants' unlawful conduct, airfares were raised, fixed, maintained and stabilized in the United States.

164.     Defendants' combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants.

165.     Defendants' conspiracy had the effect of artificially inflating the airfares charged in the United States.

166.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of the Class paid more for airfares than they otherwise would have paid in the absence of Defendants' unlawful conduct.

<strong>RELIEF REQUESTED</strong>

Accordingly, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class herein, adjudging and decreeing that:

A.     This action may proceed as a class action, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.     Defendants have engaged in combination and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff and the members of the Class have been injured in their business and property as a result of Defendants' violation;

C.     Plaintiff and the members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a judgment be entered against Defendants, jointly and severally, in favor of Plaintiff and the Class in an amount to be trebled in accordance with such laws;

D.     Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein.

E.      Plaintiff and members of the Class be awarded pre-judgment and post-judgment

interest, and that such interest be awarded at the highest legal rate from and after the date of

service of the initial complaint in this action;

F.      Plaintiff and members of the Class recover their costs of this suit, including

reasonable attorneys' fees as provided by law; and

G.      Plaintiff and members of the Class receive such other or further relief as may be

just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues triable by jury.

Dated: December 3, 2015                  LABATON SUCHAROW LLP

                                         /s/Jay L. Hines
                                         Jay L. Himes
                                         Lawrence A. Sucharow
                                         Gregory S. Asciolla
                                         Robin A. van der Meulen
                                         Marisa N. DeMato
                                         140 Broadway
                                         New York, NY 10005
                                         Tel: (212)-907-0700
                                         Fax: (212)-818-0477
                                         jhimes@labaton.com
                                         lsucharow@labaton.com
                                         gasciolla@labaton.com
                                         rvandermeulen@labaton.com
                                         mdemato@labaton.com

                                         NOSSAMAN LLP
                                         Paul L. Knight (D.C. Bar No. 911594)
                                         1666 K Street, NW, Suite 500
                                         Washington, D.C. 20006
                                         Tel: (202)-887-1400
                                         Fax: (202)-466-3215
                                         pknight@nossaman.com

                                         *Counsel for Plaintiff and the Proposed Class*